UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
TRUSTEES OF THE UNITED                    :
HEALTH AND WELFARE FUND,                                    **OPINION AND ORDER**
                                          :
                                                            08 Civ. 11219 (KNF)
              Plaintiffs,                  :

       -against-                          :

N. KOFSKY & SON, INC., KOFSKY & SON,      :
INC. a/k/a KOFSKY & SON PLUMBING,
STEPHEN KOFSKY and RICHARD KOFSKY,        :
individually and jointly and severally,
                                          :
              Defendants.
----------------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

## INTRODUCTION

The plaintiffs, Trustees of the United Health and Welfare Fund ("Fund"), brought this

action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§ 1001 et seq., and the Labor Management Relations Act of 1974 ("LMRA"), 29 U.S.C. § 152

et seq., against defendants N. Kofsky & Son, Inc. ("NKS"), Kofsky & Son, Inc. a/k/a Kofsky &

Son Plumbing ("KSI"), Richard Kofsky and Stephen Kofsky. The Fund seeks to obtain

monetary contributions that the defendants allegedly failed to pay to the Fund as required by,

inter alia, a collective bargaining agreement ("CBA") between NKS and the International

Longshoremen's Association, Local 976 ("Union"). The Fund alleges that defendants NKS and

KSI are jointly and severally liable to the Fund for unpaid contributions because, at all relevant

times, they had an alter ego or single employer relationship. The Fund also alleges that Richard

Kofsky and Stephen Kofsky are individually liable to the Fund for the unpaid

contributions because they conspired to defraud it of the required benefit contributions by transferring assets from NKS to KSI, which, since KSI is not a signatory to the CBA, enabled them to conceal NKS's financial activity.

The Court held a bench trial on the disputed issues in this case on May 19, 2014.  The direct testimony of trial witnesses was received via affidavits or declarations.  At the close of the plaintiffs' case, the defendants moved for judgment on partial findings, pursuant to Rule 52(c) of the Federal Rules of Civil Procedure. The plaintiffs opposed the motion.

## BACKGROUND

The plaintiffs commenced this lawsuit on December 24, 2008.  On July 24, 2009, NKS filed a voluntary Chapter 7 petition thereby commencing bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York.  As a consequence of that filing, the instant action was automatically stayed against the debtor, NKS.  Thereafter, on September 25, 2012, the plaintiffs filed an amended complaint.

On September 26, 2013, this Court issued a Memorandum and Order granting, in part, and denying, in part, the plaintiffs' motion for summary judgment with respect to the claims set forth in their amended complaint.  Specifically, the Court determined that no disputed issue of fact existed concerning whether NKS was liable to the Fund for unpaid benefit contributions and, therefore, granted summary judgment to the plaintiffs on the first count of their amended complaint.  The Court denied summary judgment to the plaintiffs with respect to the remaining counts of their amended complaint.  In addition, the Court determined that the scope of NKS's liability for unpaid benefit contributions was not established because the report prepared by the Fund's auditor in connection with this action was insufficient to support the plaintiffs' claims for damages, as the report relied on unsupported assumptions concerning the hours worked, the

2

wages paid and the amount of covered work performed in the relevant periods.

Prior to trial, the parties submitted a joint pretrial order setting forth, inter alia, the claims and defenses to be tried.  Following the trial, on May 28, 2014, the plaintiffs' counsel advised the Court that he had learned from the defendants' counsel that KSI had commenced a Chapter 11 bankruptcy proceeding on July 25, 2013, and that the bankruptcy proceeding was ongoing.  The bankruptcy proceeding triggered a stay of proceedings in this court respecting KSI.  See 11 U.S.C. § 362(a).  On May 28, 2014, counsel to the defendants wrote to the Court acknowledging the existence of the bankruptcy proceeding and informing the Court that a senior associate in his office had handled the proceeding and that he had forgotten about it.  By order dated May 30, 2014, the defendants' counsel was directed to advise the Court in writing within sixty days concerning his efforts to have the stay imposed by 11 U.S.C. § 362(a) relative to KSI lifted, presumably nunc pro tunc to a date prior to or contemporaneous with the date on which the trial was held.

On July 25, 2014, the defendants' counsel informed the Court, via a letter, that KSI's Chapter 11 bankruptcy proceeding was dismissed on June 30, 2014.  The Court then directed the parties to submit memoranda of law addressing the question whether the bench trial, which occurred after the automatic stay imposed pursuant to 11 U.S.C. § 362(a) took effect, was rendered void and without effect as to debtor KSI.  Thereafter, the Court considered the parties' submissions and determined that the May 19, 2014 bench trial, as it related to KSI, was void and without vitality because it occurred while the § 362(a) stay was in effect.  As the Second Circuit explained in In re Heating Oil Partners, 422 Fed. Appx. 15, 17-18 (2d Cir. 2011):

The automatic stay provision is considered one of the fundamental debtor protections provided by the bankruptcy laws. Eastern Refractories Co. v. Forty Eight Insulations Inc., 157 F.3d 169, 172 (2d Cir. 1998). . . . The stay is effective immediately upon the filing of the petition, and any proceedings or actions described in section 362(a)(1) are void and without vitality if they occur after the automatic stay takes effect. Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 527 (2d Cir. 1994) . . . . The stay takes effect automatically and without the requirement of notice to affected parties; [b]y its very terms, no action by any court is necessary for the stay to take effect. In re Colonial Realty Co., 980 F.2d 125, 137 (2d Cir. 1992). . . . The automatic stay remains in effect until the granting of a discharge injunction pursuant to 11 U.S.C. § 524(a). See 11 U.S.C. § 362(c)(2); In re James, 285 B.R. 114, 116 (Bankr. W.D.N.Y. 2002). (internal quotation marks omitted).

See also Garrity v. Hospital Consultants, Inc., 128 B.R. 333 (S.D.N.Y. 1991) (finding that a shareholder derivative suit brought against, inter alia, the parent corporation violated automatic stay provision).

The Court held a conference with counsel for the parties. During the conference, the Court noted that the parties had already expended considerable time and resources preparing for and conducting the trial held on May 19, 2014, and that, at a new trial (to which KSI is entitled because of the breach of the stay), it was likely that the Court would hear the same evidence it heard previously regarding KSI. Hence, in order to ensure an economical and efficient litigation, as Fed. R. Civ. P. 1 urges, the Court proposed that the parties consider that the trial for KSI be conducted on a stipulated record, that is, the record already generated during the May 19, 2014 bench trial, including the testimony and exhibits introduced during that proceeding. Thereafter, on December 4, 2014, the parties filed a stipulation setting forth their desire that the record generated on May 19, 2014, be the record for the KSI trial and that the Court proceed to determine the defendants' Fed. R. Civ. P. 52(c) motion with respect to the May 19, 2014 trial and the KSI trial on the stipulated record. See Docket Entry No. 93.

## CREDIBILITY DETERMINATIONS

In a bench trial, "[i]t is within the province of the district court as the trier of fact to decide whose testimony should be credited." Krist v. Kolombos Rest., Inc., 688 F.3d 89, 95 (2d Cir. 2012) (citation omitted). See also Newman v. Herbst, No. 09-cv-4313, 2011 WL 684165, at *1 (E.D.N.Y. Feb. 15, 2011) ("In any bench trial, the trial judge has to evaluate the credibility of the witnesses that testify, the witnesses' demeanor, any previous inconsistent statements by a witness, as well as the witness's explanation for any such inconsistent statements.").

The Court has reviewed all the evidence and submissions and has made evaluations of the credibility of the witnesses and the merits of the parties' submissions.[1] Based on its review, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT[2]

The Fund is a jointly-administered, multi-employer, labor-management trust fund established and maintained pursuant to a collective bargaining agreement and certain trust agreements. The Fund maintains business offices in Englewood Cliffs, New Jersey. The purpose of the Fund is to receive and collect benefit contributions and to provide various benefits to eligible employees on whose behalf employers contribute to the Fund, pursuant to their

---

[1] The Court notes that, in assessing the credibility of the witnesses, it has taken into consideration the fact that the defendants failed to disclose that KSI had filed a Chapter 11 bankruptcy petition prior to the time of the bench trial, and that Richard Kofsky, when asked during the May 19, 2014 trial, whether KSI had ever filed for bankruptcy, testified that it had not.

[2] Inasmuch as the parties stipulated that the record generated at the May 19, 2014 trial is the record for the KSI trial, the Court's findings of fact and conclusions of law, set forth below, apply to both trials.

collective bargaining agreements.

At the time this action was commenced, defendants NKS and KSI were for-profit corporations doing business in the state of New York and engaged in the plumbing trade. At all relevant times, Richard Kofsky was the president and sole shareholder and owner of NKS and the owner of fifty-one percent (51%) of the shares of KSI, and Stephen Kofsky, his son, was the owner of forty-nine percent (49%) of the shares of KSI.

NKS filed a voluntary Chapter 7 petition for bankruptcy on July 24, 2009. As a result, NKS is no longer in business. KSI was incorporated in or about March 2007. According to the direct testimony declaration of Richard Kofsky, which was admitted into evidence during the trial, "it is uncontested that KSI was not formed until approximately six months after the commencement of [NKS's] bankruptcy proceedings." However, during cross-examination, Richard Kofsky testified that certain employees of NKS became employees of KSI about "two or three weeks" after NKS filed for bankruptcy.

On or about March 6, 2004, NKS entered into the CBA with the Union. A copy of the CBA was received into evidence at trial.[3] The CBA between NKS and the Union required NKS to make contributions to the Fund in specific amounts for each hour of work "for each day a regular employee works" in an area of employment covered by the CBA. The CBA covered workers engaged in "the industry of maintenance of existing buildings, including plumbing replacement, restoration, [and] . . . all other related work . . . in the classifications set forth in [the CBA]." The CBA also provided that the Union had the right to audit the payroll records of the employer, here, NKS, at any given time.

---

[3]Exclusive of handwritten notes on the cover page of the CBA.

The CBA became effective on March 6, 2004, and included a provision stating that it would "continue in full force and effect until midnight on March 5, 2007," when it would terminate, provided proper and timely notice was given by the party seeking termination. If a party failed to provide such notice, the CBA, by its terms, would "automatically renew for further periods of one (1) year."

The credible evidence presented at trial established that neither party gave such notice to the other and, hence, that the CBA remained in effect at least until NKS filed for bankruptcy and ceased operations. NKS made contributions for its employees to the Fund as required by the CBA until at least 2002. Richard Kofsky testified that NKS ceased making contributions to the Fund because it could no longer afford to make them. It is undisputed that KSI was not a signatory to the CBA, never signed a collective bargaining agreement with the Union and made no contributions to the Fund.

Regarding the operations of NKS, Richard Kofsky testified, through his direct testimony declaration, that "[w]hile both companies perform plumbing work, NKS served a high-end, 'luxury' client base, such as the Trump Organization [whereas] [t]he clients of KSI . . . are generally much less wealthy than those served by NKS." Richard Kofsky testified further that "[m]ost of the clients NKS worked with do not work with KSI [and] [t]he inverse is also true–most of KSI's clients were not clients of NKS." (Emphasis in original). Richard Kofsky testified that while "NKS had nine union employees; only three of these individuals are employed by KSI."

During cross-examination, Richard Kofsky testified that, at all relevant times, both NKS and KSI were located at 1525 Bassett Avenue, Bronx, New York. Prior to July 2009, NKS held a lease for this office space; the lease was terminated upon NKS's filing for bankruptcy.

7

Thereafter, in or around 2009, KSI entered into a separate lease for the office space.

During cross-examination, Richard Kofsky testified that the employees of NKS performed plumbing work, carpentry work, tile work, painting and general contracting work on existing buildings in the boroughs of Brooklyn and the Bronx in New York. Most of the buildings in which the work was performed were residential, while a small percentage of the buildings were commercial. Richard Kofsky denied that employees of NKS performed "maintenance" work, explaining that maintenance involves repairing old valves whereas his company installs new valves: "so it's plumbing, not maintenance." According to Richard Kofsky, KSI does work that is more "generic" such as "replacing gas lines or replacing water lines and the only work that we're doing in regards to restoration would be the small patching of the holes that we make to install these new lines." By contrast, NKS performed "complete renovations of bathrooms and kitchens with the tenants living there in place which included carpentry work or joist replacement and replacement of all walls and floors and the plumbing, water and waste. The work was much more extensive much more labor intensive and much more money than what we're doing now."

During cross-examination, Richard Kofsky testified that, at the time NKS filed for bankruptcy, he had extensive communications with the bankruptcy trustee during which he advised the bankruptcy trustee of the existence of KSI. During redirect examination, Richard Kofsky testified that, as part of the process of the bankruptcy of NKS, he appeared for a meeting of creditors, one of which was an attorney representing the Union, and that he answered questions put to him by that individual.

Richard Kofsky denied that any equipment belonging to NKS was "transferred" to KSI. Rather, at the time of the bankruptcy of NKS, the company's equipment, which included three

Ford vans, tools and office furniture, was purchased by KSI.  According to Richard Kofsky, "the [bankruptcy] trustee sent an auditor to the offices of [NKS] who did an extensive listing of all of the material and its value.  And that was also purchased by [KSI] from [NKS].  The check was then given to the trustee. And the trustee included [those] proceed[s] into the disbursement of the funds."

Richard Kofsky testified further concerning his son, Stephen Kofsky.  Richard Kofsky testified that Stephen Kofsky is now, <u>inter alia</u>, a licensed master plumber, that he does the "majority of the permit work" and the "majority of the inspection work for the City of New York."  Richard Kofsky testified further that Stephen Kofsky was an employee of NKS for about four to five years, that he began work as a laborer in the field and thereafter performed office and supervisory duties.  During that period, Stephen Kofsky had no authority to hire or terminate employees.  As a part owner of KSI, Stephen Kofsky has the ability to hire and fire employees, to decide which job location the employees are sent to, "whether or not they're producing enough or whether or not if somebody calls out sick to bring a doctor's note."

Richard Kofsky testified further that at the time of NKS's bankruptcy, the Internal Revenue Service filed a claim against NKS for unpaid payroll taxes and other withholding taxes in the amount of approximately one million dollars; in addition, the New York State Department of Taxation also filed a claim against NKS for taxes owed to the state.  Richard Kofsky testified that part of the Internal Revenue Service tax debt was paid by the bankruptcy trustee from the proceeds of the sale of the assets of NKS as well as the proceeds from the sale of a home in Florida.

In addition, testimony given by Richard Kofsky at the time of his deposition, which was admitted into evidence during the trial and incorporated into the record, indicated that Richard

Kofsky had arranged for payment to the Internal Revenue Service of $5,000 per month, for twelve years, from proceeds of the entities Rush 21 and Rush Realty, to be applied to the tax liability of NKS.  Richard Kofsky testified further that he was personally responsible for the tax liability of NKS, as the former owner of the defunct corporation, but denied that KSI had assumed responsibility for that debt.

The credible testimony presented at trial established that the bank accounts of the two companies were at all times completely separate.  Office personnel, a secretary and a receptionist, previously employed by NKS, became employees of KSI.  KSI has twenty-one employees of whom fourteen or fifteen are plumbers.  Of these individuals, three previously worked for NKS.

The plaintiffs retained David Falda ("Falda"), a certified public accountant, to perform an audit to assess the defendants' benefits payment compliance.  In his direct testimony declaration, which was received into evidence at trial, Falda stated that he had been an auditor for the plaintiffs for about ten years.  According to Falda, the audit performed by him in connection with this matter consisted of reviewing relevant documents such as the CBA and the defendants' payroll and tax records and cash disbursement journals in order to assess the amount of the defendants' delinquency with respect to contributions owed to the Fund for hours of work performed by the defendants' employees.

Falda stated that he "discovered" KSI's existence while preparing the audit.  Falda stated that he concluded that KSI was an alter ego of NKS based on, inter alia, his interview with Richard Kofsky and a review of the payroll records of both companies.  Falda decided that a review of the records of KSI for the purposes of the audit was warranted, even though that entity was not a party to the CBA, based on his judgment that KSI was an alter ego of NKS.

10

Falda explained that he examined the documents available to him but noted that he was not given any payroll tax forms for NKS for the period January 2008 through July 2009; as a result, he had no data for those months.  Falda explained further that he determined that the employees identified in the payroll records were performing work covered by the CBA based on his review of payroll records and conversations he had with the defendants' accountant.  Falda avers that because he did not receive a complete set of records from the defendants, including "weekly documents for the earlier years" and corporate tax returns, his audit report is based on "reasonable assumptions as to the periods worked" and that his report provides a "reasonable worksheet" and "reflects true and actual amounts" due from both corporate defendants.

Based on his investigation, Falda determined that NKS owes the Fund $5,359,536 in unpaid contributions and $213,887 in unpaid Union dues for the period 2002 through 2008.  Falda also determined that KSI owes the Fund $792,288 in unpaid contributions and $25,572 in unpaid Union dues for the period 2009 through 2012.

During cross-examination at trial, Richard Kofsky testified that he had never met Falda and that Falda had worked directly and exclusively with the accountant for NKS and KSI, Lawrence Fleischman ("Fleischman").  According to Richard Kofsky, Fleischman prepared tax returns for NKS and KSI, but did not handle payroll for either company.  Richard Kofsky testified that all payroll records for both NKS and KSI are held by Fleischman.

Richard Kofsky also testified that no payroll records were produced at trial pursuant to a subpoena served on him by the plaintiffs because Fleischman, who possesses such records, was ill and defendants were unable to access the documents.  Richard Kofsky testified that he had instructed Falda to direct all questions relating to the audit of NKS and KSI to Fleischman and authorized Fleischman to answer any questions relating to the audit.

The document identified as the audit report prepared by Falda was received into evidence at trial.  During cross-examination, Richard Kofsky testified concerning the accuracy of the audit report that "[t]he original agreement with collective bargaining with the local was for nine employees. You have much more than nine employees listed on this piece of paper."  According to Richard Kofsky, the audit report listed, in addition to employees who performed plumbing work, employees who were "carpenters, painters, plasterers, etc."  Richard Kofsky maintained that those individuals did not perform maintenance work; rather, they were "building new bathrooms and new kitchens, new Sheetrock, new plastering, new plumbing."  Richard Kofsky testified that he did not "refuse the auditor access to the books and records of NKS."

During cross-examination by the defendants' attorney, Falda testified regarding the delinquencies attributed to KSI in the audit report as follows:

> Q.    And the audit report sets forth the benefit contribution delinquencies attributable to [KSI] for the liability with respect to such alleged delinquencies. You've not established that liability right?
>
> A.    Would you clarify.
>
> Q.    These are based on assumptions?
>
> A.    They're very, very, very, strong assumptions.
>
> Q.    But those are assumptions, right? Yes or no?
>
> A.    They are over 99 percent reasonable and correct.
>
> Q.    But they are assumptions, correct?
>
> A.    They are assumptions.

During redirect examination, Falda testified that, following his request for documents from the defendants for use in preparing the audit, he was "denied almost everything."  Falda

testified that he had no direct communication with Richard Kofsky regarding the audit. Falda testified further that he never received "any feedback of any type" from Fleischman regarding the contents of the audit report.

Falda testified that he determined which names to include in the report after consulting with Fleischman: "I sat in . . . Fleischman's office and began the audit by reviewing all quarterly wage reports. I asked: Are these people part of the union? He said probably. And he never changed or contradicted anything that I saw within those documents." Falda testified further regarding how he arrived at the summary of calculations contained in the audit report: "I was never given time sheets and I had to approximate the number of weeks each one of the employees listed on the payroll records worked." Thereafter, the Court questioned Falda concerning the audit report as follows:

> THE COURT: When you indicate in your declaration [of direct testimony] that you prepared an estimated audit, what standards, if any, govern an estimated audit.
>
> THE WITNESS: The audit estimate is based upon the approximate number of weeks and the approximate payroll that each employee earned. I questioned Mr. Fleischman as to what each person earned. He was the keeper of, so to speak, the records. And he indicated to me, he gave me some input as to approximately what each person earned. And from that I determined the number of weeks and the amount of taxable payroll.
>
> THE COURT: There are governing bodies that prepare standards for accountants to go about their professional responsibilities, isn't that correct?

13

THE WITNESS:      There are.

THE COURT:        And those accounting bodies establish standards for accountants to follow in performing their professional responsibilities; isn't that correct?

THE WITNESS:      There are.

THE COURT:        What standards, if any, govern an estimated audit as you use that phrase in your declaration?

THE WITNESS:      Those standards basically want to determine: Was their employment? Did these people actually work for the company? What periods of time did they work? What type of work did they conduct?

And based on that information, since I was not given any other feedback information or time or weekly payroll records, I used those reasonable and what I would call in the accounting parlance fair and reasonable records of determining time worked and periods involved.

THE COURT:        Are the elements that you indicated you used elements that are established by some accounting body?

THE WITNESS:      There is no specific body for conducting a payroll audit per se, but it's an accumulation of noncertified audit reports that would be put together.  And each set of circumstances would be different.

THE COURT:        So if I'm understanding correctly, there are no standards for conducting such a payroll audit as you performed that are

14

sanctioned by any governing body that supervises or directs the

professional work of accountants such as yourself?

THE WITNESS:    That is correct.  And it's the same standard that would be applied

by the Internal Revenue Service, etc., in determining payroll,

Department of Labor standards that were would be determined for

labor employment and records of that type.

THE COURT:    Someone other than yourself preparing a payroll audit such as

you've testified you conducted here would be free to include or

exclude some of the elements that you've just articulated because

there is no standard governing such an audit; is that correct?

THE WITNESS:    That is correct.  However, normally the more supplied information

such as time sheets, worksheets, etc., the more accurate, the more

definitive such an audit would be. This is the same standard

applied by the Internal Revenue Service.

Thereafter, the Court heard testimony from Alfred Piscino ("Piscino").  In his direct

testimony declaration, Piscino stated that he had been the Fund Administrator to the United

Health & Welfare Fund for more than ten years.  On cross-examination, Piscino testified that he

understood both corporate defendants to be engaged in the building maintenance and plumbing

business.  Piscino stated that his understanding was based on his "prior dealings with Mr.

Richard Kofsky who holds a master plumber's license.  And just plain, I guess it would be fair to

assume if he was in business again with a new entity it would be a plumbing business."

Concerning the matter of the relationship between NKS and KSI, Piscino testified as follows:

Q.    [In your direct testimony declaration], you go on to say: Based on Mr. Falda's

audit results immediately after [NKS] filed bankruptcy, [KSI] . . . continued the

operations of NKS and was a successor employer and alter ego company.

Is that your – did you sign that under oath?

A.     Yes.

Q.     Is that based on your  – do you have personal knowledge of that?

A.     Yes.

Q.     That they're alter egos of one another? You have personal knowledge of that?

A.     Alter egos, no.

Q.     Because you say, "An alter ego company to and performing the same work."

A.     They are performing the same work.  As far as the term alter ego, I believe that's

a legal term and I'm not in a position to provide that to be correct or incorrect.

Following the testimony of Piscino, the defendants moved for judgment on partial

findings, pursuant to Rule 52(c) of the Federal Rules of Civil Procedure.

## CONCLUSIONS OF LAW

Rule 52(c) of the Federal Rules of Civil Procedure provides:

If a party has been fully heard on an issue during a nonjury trial and the court
finds against the party on that issue, the court may enter judgment against the
party on a claim or defense that, under the controlling law, can be maintained or
defeated only with a favorable finding on that issue. The court may, however,
decline to render any judgment until the close of the evidence.  A judgment on
partial findings must be supported by findings of fact and conclusions of law as
required by Rule 52(a).

Fed. R. Civ. P. 52(c).

Pursuant to 29 U.S.C. §§ 1132(g) and 1145, a multi-employer plan is authorized to

collect delinquent benefit contributions and employers are obligated to make such contributions

16

under the terms of the plan or a collective bargaining agreement.[4]

*Liability Under an Alter Ego or Single Employer Theory*

---

[4]  29 U.S.C. § 1132(g) provides, in pertinent part:

g) Attorney's fees and costs; awards in actions involving delinquent contributions

1.
    **(1)** In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

    **(2)** In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan--

        **(A)** the unpaid contributions,

        **(B)** interest on the unpaid contributions,

        **(C)** an amount equal to the greater of--

            **(i)** interest on the unpaid contributions, or

            **(ii)** liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

        **(D)** reasonable attorney's fees and costs of the action, to be paid by the defendant, and

        **(E)** such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1145 provides, in pertinent part:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

The plaintiffs contend that NKS and KSI are jointly and severally liable for unpaid benefit contributions to the Fund because they acted in concert with each other to form a single employer or alter ego arrangement to avoid making Fund contributions.

"[A] collective bargaining agreement may be enforced against non-signatory employers if the employers constitute a 'single employer' and if the employees of the companies constitute a single appropriate bargaining unit." Brown v. Sandimo Materials, 250 F.3d 120, 128 n.2 (2d Cir. 2001) (citing Lihli Fashions Corp. v. NLRB, 80 F.3d 743, 747 (2d Cir. 1996)). Separate companies are considered a "single employer" if they "are actually part of a single integrated enterprise." Clinton's Ditch Coop. Co., Inc. v. NLRB, 778 F.2d 132, 137 (2d Cir. 1985).

When determining whether two companies constitute a single employer, courts look to four factors, "none of which is controlling and not all of which need be present: (1) interrelation of operations; (2) common management; (3) centralized control of labor functions; and (4) common ownership. Family connections and the common use of facilities and equipment are also relevant." Brown, 250 F.3d at 128 n.2 (citations omitted). Factors to be considered when determining whether the defendants' employees constitute a "single appropriate bargaining unit" are whether they share a community of interests, as well as their "bargaining history, operational integration,  geographic proximity, common supervision, similarity in job function and degree of employee interchange." Id. (citations omitted).

"While the alter ego doctrine has the same binding effect on a non-signatory as the single employer/single unit doctrine, the two doctrines are conceptually distinct." Lihli Fashions Corp., 80 F.3d at 748 (quoting Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking Co., 944 F.2d 1037, 1046 (2d Cir. 1991)) (internal quotation marks omitted). "The focus of the alter ego doctrine . . . is on the existence of a disguised continuance or an attempt to

18

avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations." Id. "The hallmarks of the alter ego doctrine include whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." Id. (citation omitted).

Based on the credible evidence presented during the trial, the Court finds that the plaintiffs have failed to establish that NKS and KSI constituted a single employer.[5] The plaintiffs have not shown that the employees of the two companies constitute a "single appropriate bargaining unit," which is a necessary element of single employer status. Brown, 250 F.3d at 128. Moreover, the single employer rule implies that the companies involved must actively employ workers. However, in this case, it is undisputed that NKS is no longer in business. Hence, although the companies are both engaged in the plumbing business, operated out of the same Bronx County office, and were managed and wholly or partly owned by the same individual, namely, Richard Kofsky, it cannot be said that the two companies constitute a single employer.

Further, no evidence exists that KSI was merely a "disguised continuance" of NKS or an attempt to avoid the obligations of the CBA through a "sham transaction or technical change in operation." Lihli, 80 F.3d at 748. While it is disputed that the two companies were both managed, at least in part, by Richard Kofsky, and shared a Bronx County office, the companies had separate bank accounts, separate leases for the shared office space, and different ownership arrangements. In addition, the nature of the work performed by the two companies differed in

_____

[5]The determination that the two companies do not constitute a single employer was made at the time the Court ruled on the plaintiffs' motion for summary judgment. The Court finds that no new evidence that would upset that conclusion was presented at trial.

that the work performed by NKS involved restoration whereas the work performed by KSI was

more limited.  NKS performed plumbing work, carpentry work, tile work, painting and general

contracting work on existing residential buildings, while KSI does work that is more "generic"

such as "replacing gas lines or replacing water lines."  The only work done by KSI that involves

restoration is the "patching of the holes" made "to install these new lines."  By contrast, NKS

performed "complete renovations of bathrooms and kitchens with the tenants living there in

place which included carpentry work or joist replacement and replacement of all walls and floors

and the plumbing, water and waste."  It was much more extensive[,] much more labor intensive

and [involved] much more money than what [KSI is] doing now."

      Although some overlap exists in clients, according to the testimony of Richard Kofsky,

most of the clients of NKS were not taken over by KSI.  Additionally, of the nine union

members who were employed by NKS, only three were employed by KSI.  Testimony also

established that KSI has not assumed responsibility for the tax arrears of NKS.

      The plaintiffs assert that the formation of KSI, after the commencement of bankruptcy

proceedings, shows that it was established as an operation to evade NKS's obligations to its

creditors and that the transaction was merely a "technical change" in the corporate form of the

business from one corporation to the other.  However, the testimony presented at trial does not

support this assertion.

      Under the circumstances, the Court finds that the plaintiffs have not shown that KSI is an

alter ego of NKS and, thus, have not established that KSI, which was not a signatory to the CBA,

may be held liable for any breach of that contract.  Therefore, the defendants' motion to dismiss

the plaintiffs' claim that KSI is liable for benefit contributions to the Fund, based on an alter ego

or single employer theory, is granted.

*Personal Liability of Individual Defendants*

The plaintiffs argue that liability should be imposed on individual defendants Richard Kofsky and Stephen Kofsky for Fund contribution delinquencies found by the auditor during his investigation. The plaintiffs contend that the individual defendants transferred NKS's business to KSI deliberately and wilfully while simultaneously placing NKS in bankruptcy and failed to disclose the existence of KSI and to submit payroll records and contributions to the Fund for employees of KSI. According to the plaintiffs, Richard Kofsky and Stephen Kofsky established a single employer or alter ego relationship between the corporations with the express intent of avoiding their contribution obligations to the Fund; and the Fund relied reasonably on their misrepresentations to its detriment in an amount in excess of one million dollars.

"Generally, an individual is not liable for corporate ERISA obligations solely by virtue of his role as officer, shareholder, or manager. However, to the extent that a controlling corporate official defrauds or conspires to defraud a benefit fund of required contributions, the official is individually liable under Section 502 of ERISA, 29 U.S.C. § 1132." New York Dist. Council of Carpenters Pension Fund v. Perimeter Interiors, Inc., No. 06 Civ. 6377, 2009 WL 362640, at *4 (S.D.N.Y. Feb. 13, 2009) (citations and internal quotation marks omitted).

"[T]o prove fraud, a plaintiff must demonstrate: (i) a material false representation or omission of an existing fact, (ii) the defendant's knowledge of the falsity, (iii) the defendant's intent to defraud, (iv) the plaintiff's reasonable reliance upon the misrepresentation or omission, and (v) consequent damage to the plaintiff." Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo, 148 F.3d 194, 196 (2d Cir. 1998).

Based on the credible evidence presented at trial, the plaintiffs have not established that the individual defendants conspired to defraud the Fund. The plaintiffs' auditor stated in his direct testimony declaration that he "discovered" KSI's existence during his investigation of NKS but no evidence showing that the defendants were attempting to conceal the existence of that corporate entity exists. On the contrary, the testimony of Richard Kofsky established that he had extensive discussions with the bankruptcy trustee at the time of the 2009 bankruptcy filing concerning KSI and that an attorney for the Union was present at a creditors' meeting held in connection with the bankruptcy proceeding. Hence, the plaintiffs have not demonstrated a material false representation or omission by the defendants, especially given that KSI was not a signatory to the CBA. Since KSI was not a signatory to the CBA, and hence was not liable for any contribution delinquencies, a failure, if any existed, to disclose the existence of KSI does not constitute evidence of a misrepresentation or omission on the defendants' part. Moreover, in the face of Richard Kofsky's denial that KSI was formed with the purpose of evading NKS's contribution obligations to the Fund, the plaintiffs cannot demonstrate an intent to defraud. Hence, for these reasons, the personal liability of the individual defendants has not been established and the plaintiffs' claims against the individual defendants are therefore dismissed.

*Scope of Liability*

"[C]ourts have found it appropriate to rely on an audit or an auditor's opinion to prove that defendant employers did not make required contributions to funds." Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of the Int'l Union of Operating Engineers, Local 15, 15A, 15C & 15D, AFL-CIO v. Eastport Excavation & Utilities Inc., No. 11 Civ. 4112, 2014 WL 998426, at *8 ( S.D.N.Y. Mar. 17, 2014) (citation omitted). However, a court "must examine whether the assumptions and techniques relied upon by the auditors were reasonable, or

rather rendered the Plaintiffs' audit simply 'too speculative to support a finding' of damages."

Mason Tenders Dist. Council Welfare Fund v. M.A. Angeliades, Inc., No. 05 Civ. 8211, 2007

WL 4208587, at *4 (S.D.N.Y. Nov. 20, 2007) (quoting Mastrandrea v. Nassau Land

Improvement Co., Inc., 182 F.3d 900 (2d Cir. 1999)).  If a plaintiff fails to establish that an

employer's records were inaccurate, the plaintiff "bear[s] the burden of proof to establish its

claim with regard to unpaid fringe benefit contributions, dues checkoffs, and PAC contributions.

Id. at *7 (finding that "[w]ithout personal knowledge as to the duties performed by each

employee, the auditor made unreasonable assumptions and questionable judgment calls which

tainted the audit's findings of unreported hours [and] [t]he audit results, therefore, are

insufficient to establish Defendants' liability for unpaid fringe benefit contributions.").

The plaintiffs assert entitlement to damages in the amounts set forth in the audit report

received into evidence at trial.  Additionally, the plaintiffs contend that the defendants have

failed in their obligation to challenge, with admissible evidence, the results of the audit and the

amount of damages generally.

The audit report, which was received into evidence at trial, provides no explanation or

information regarding the procedure(s) used to calculate the alleged deficient contributions for

the employees named in the report, nor does it contain any information concerning the type of

work performed or whether it was work covered by the CBA.  For example, the first section of

the report is titled "N. Kofsky & Sons Plumbing" and subtitled "Payroll Worksheet" for the

period "2002 (all) to 1st qtr 2009."  The report includes five columns headed as follows: "Name

(Last, First)" "SS#" "Date Hired" "Date Fired" "dh/df" and "Weeks."  Under the first column

heading is a list of over 200 names.  The report contains no information concerning the

individuals named, such as their respective job titles or the type of work each performed.  The

next four columns contain no information; they are simply blank. The fifth column, "Weeks," contains a list of numbers, presumably associated with the corresponding name in the first column, including the number "52" as well as, e.g., "16," "13," and so on. Two additional column headings are included under the "Weeks" column; these are titled "1st" and "2nd." Under each of these headings is a list of numbers, presumably associated with the names given in the first column. However, approximately half of the names have no number associated with them. At the bottom of the list of names appears the word "Totals" and the numbers "548235" and "514450."

The next part of the report contains three columns with the following headings: "Totals," "Dues," "UHW Fund Total." Under each heading is an amount for each year from 2002 through 2008. The amounts given are not associated with any employee or with a type of work any employee may have performed or whether it was work covered by the CBA. The remainder of the report, which consists of 100 pages, appears to pertain to "Kofsky & Sons, Inc."

The auditor, who prepared the report, was not questioned at trial, by the plaintiffs' counsel, concerning the contents of the report. Further, by his own admission, the auditor arrived at his calculations by making assumptions about hours worked and wages paid when data were unavailable to him. In addition, the auditor acknowledged that no standards exist for conducting an audit such as he performed, that are sanctioned by any governing body that supervises or directs the professional work of accountants. The plaintiffs have offered no evidence to support their claims about the amount of CBA-covered work performed in the relevant periods, relying only on their auditor's assertion that all the work involved was work covered by the CBA. Nor have the plaintiffs provided any evidence from which an inference could be drawn to the effect that all the work done by NKS was covered by the CBA, relying

24

which itself rests upon unsupported assumptions.  Moreover, the audit report sets forth delinquencies attributed to KSI.  As discussed earlier, however, KSI's liability with respect to alleged delinquencies was not established. Therefore, the Court finds that the audit is not sound and the plaintiffs have not established that the defendants owe fringe benefit contributions.

## CONCLUSION

For the reasons set forth above, the Court finds that the plaintiffs have not met their burden of proving, by a preponderance of the evidence, that they are entitled to the relief they seek.  The defendants' motion(s) for judgment on partial findings is therefore granted, and the action is dismissed.

Dated: New York, New York        SO ORDERED:
        January 5, 2015

                           KEVIN NATHANIEL FOX
                           UNITED STATES MAGISTRATE JUDGE